Prescott v. Duncan.

◆

H. P. PRESCOTT *et al. v.* J. B. DUNCAN *et al.*

*(Jackson.* April Term, 1912.)

1. CONSTITUTIONAL LAW. Quarterly county court is a constitutional court that cannot be abolished by legislative enactment.

The quarterly county court, though not mentioned in the constitution of 1870, nor in the prior constitutions, is nevertheless a constitutional court which cannot be abolished by legislative enactment; for its existence as a creature of the constitution must be implied from the constitutional provisions that necessarily refer to it, particularly such as confer "upon the justices of the peace" the performance of certain duties which could only be done by them in their collective capacity, or direct the performance of political administrative duties by the county court which had always been performed by the quarterly county court, and not by the quorum court or monthly court, because in such cases the constitutional convention must have had in mind the quarterly county court. (*Post, pp.* 118-134.)

Constitution cited and construed: Art. 1, secs. 6, 7; art. 2, sec. 26; art. 6, sec. 15; art. 7, sec. 2; art 11, secs. 1, 9, 17; schedules to the three constitutions.

Cases cited and approved: Pope v. Phifer, 3 Heisk., 682; Redistricting Cases, 111 Tenn., 234.

2. SAME. Legislative power is only limited by federal and State constitutions.

The legislature has all legislative power not prohibited by the constitution of the United States or the constitution of this State, either expressly or by necessary and fair implication. (*Post, p.* 127.)

Case cited and approved: Jackson v. Nimmo, 3 Lea, 599.

Prescott v. Duncan.

3. **SAME.   Doubtful clause should be construed in connection with whole instrument.**

Where a clause of the State constitution standing by itself is of doubtful import, the whole instrument should be examined with a view of ascertaining the true intent of the clause in question. (*Post, pp.* 127, 128.)

4. **SAME.   Object of construction is to ascertain intent; presumption as to precision in language to convey meaning.**

The object of construction of a written constitution is to give effect to the intent of the people in adopting it, but this intent is to be found in the instrument itself; and it is to be presumed, unless an examination of the instrument demonstrates otherwise, that language has been employed with sufficient precision to convey the meaning intended; and the ascertained intent must be enforced. (*Post, p.* 128.)

5. **SAME.   Constitution construed as prospective, unless clearly shown to be retrospective.**

Constitutions should be construed to operate prospectively unless clearly intended, as shown by the words used, to have a retrospective effect. (*Post, p.* 128.)

6. **SAME.   Legislature may deprive county court of all power not conferred upon it by the constitution.**

From the foregoing generally accepted rules of construction (as shown in headnotes 2, 3, 4, and 5), it is manifest that the legislature may take from the county court all power not conferred upon it by the constitution, expressly or by necessary implication. (*Post, pp.* 129, 130.)

7. **SAME.   Implications may support powers and restraints, but cannot do violence to a plainly expressed intention.**

The powers conferred by the constitution, as well as its restraints upon inherent power, may be supported by such implications as are necessary to give effect to the intent of the people in conferring the one or setting the bounds of restraint upon the other; but, in drawing implications, the whole instrument must be considered, and no implication of intention with respect to

one part of the instrument can be justified where such implication does violence to a plainly expressed intention to be found in another part. (*Post, p.* 130.)

8. **SAME. Quarterly county court is impliedly imbedded in the constitution of 1870.**

The quarterly county court is impliedly imbedded in the constitution of 1870; and this implication arises solely from the delegation, by that instrument, of certain duties to "justices of the peace" and to the "county court," which could only be performed by them when assembled in a body, an assemblage well known at the time as the quarterly county court; for the implication that the quarterly county court is a constitutional court is necessary in order to give effect to the plainly expressed intention that the "justices of the peace" and the "county court" shall perform the duties directly imposed upon them. (*Post, p.* 130.)

9. **SAME. Quarterly county court is a constitutional court alone for the purpose of performing the functions imposed upon it by the constitution; powers conferred by legislature may be repealed by legislature.**

While the constitution of 1870 does not expressly mention the quarterly county court, yet it impliedly recognizes and continues it by the provision (art. 7, sec. 1) that "There shall be elected for each county by the justices of the peace, one coroner, and one ranger"; by the provision (art. 7, sec. 2) that vacancies "in the office of sheriff, trustee, or register . . . shall be filled by the justices"; and by the provision (art. 11, sec. 17) that "No county office created by the legislature shall be filled otherwise than by the people or the county court"; for these powers can be performed by the justices only when assembled in the body known as the quarterly county court, and it cannot be deprived of these constitutional powers by the legislature; but the constitution did not impliedly confer upon that court all of the extensive governmental and administrative powers theretofore conferred on it by the legislature, and such powers so conferred by the legislature may be taken away by the legis-

Prescott v. Duncan.

lature. The quarterly county court was held in existence by the constitution alone for the purpose of performing the duties directly imposed upon it by that instrument. Therefore, the statute (Private Acts 1911, ch. 237) creating a board of county commissioners in certain counties, with substantially all the statutory powers and functions of the quarterly county court; but with none of its powers, specifically mentioned in the constitution, is not unconstitutional and void as depriving that court of its constitutional powers, especially in view of the provision (art. 6, sec. 1) that inferior courts of justice may be ordained at the discretion of the legislature, and the further constitutional provision (art. 11, sec. 9) that "The legislature shall have the right to vest such powers in the courts of justice, with regard to private and local affairs, as may be expedient." The implied constitutional recognition and continuance of the quarterly county court for the performance of the functions so specified in the constitution did not import into the constitution all the powers which that court possessed by statute as a part of the existing system of government. (*Post, pp.* 113, 118-143, and especially 120-143.)

Acts cited and construed: Acts 1911 (Private). ch. 237.

Constitution cited and construed: Art. 6, secs. 1, 8; art. 7, secs. 1, 2; art. 11, secs. 9, 17.

Case cited and approved: State, ex rel., v. Powers, 124 Tenn., 553.

Cases cited, distinguished, and approved: Cannon Co. v. Hoodenpyle, 7 Humph., 145; Railroad v. County Court, 1 Sneed, 637; Young v. Shumate, 3 Sneed, 369; Felts v. Memphis, 2 Head, 651; Pope v. Phifer, 3 Heisk., 682; Grant v. Lindsay, 11 Heisk., 651; Wood v. Tipton Co., 7 Bax., 112; Jackson v. Nimmo, 3 Lea, 597; Railroad v. Wilson Co., 89 Tenn., 597; Walsh v. Crook, 91 Tenn., 388; Shelby Co. v. Exposition Co., 96 Tenn., 653; State v. Cummins, 99 Tenn., 667; Judges' Salary Cases, 110 Tenn., 370; State v. Akin, 112 Tenn., 603.

10. SAME. The constitutional assumption of existence of laws does not import them into the constitution, except when.

The rule of construction that the constitution assumes the existence of a well understood system of government which is to

Prescott v. Duncan.

remain in force and be administered under the limitations and restrictions therein imposed can be resorted to only in the interpretation of the words employed to express such limitations and restrictions, and cannot be used to import into the constitution the existing system of government, except when some provision in the instrument itself would fail of its purpose, unless supported by such an implication. (*Post, pp.* 131, 132.)

11. **SAME.** Appointees of county commissioners, without fixed terms, without specific duties, without salaries, but with maximum rates of compensation, are not county officers whose election must be by the people or the county court.

The statute (Private Acts 1911, ch. 237, sec. 8), authorizing the board of county commissioners, created by said act, to appoint a jail physician, superintendent of county morgue, superintendent of hospital, physician of asylum and workhouse, jail engineer, courthouse janitor, courthouse engineer, courthouse electrician, courthouse policeman, and a night watchman, with no fixed terms of office and no fixed salaries, but with fixed maximum rates of compensation, with no specific duties to be performed, but employed to aid the commissioners to perform the duties imposed upon them, is not unconstitutional in authorizing the commissioners to fill offices created by the legislature, because such appointees are not county officers, but mere employees. (*Post, pp.* 143-147.)

Acts cited and construed: Private Acts 1911, ch. 237, secs. 3, 4, 7, and 8.

Constitution cited and construed: Art. 11, sec. 17.

12. **SAME.** Vacancies occurring in the board of county commissioners, or in positions to be filled by it, after they have been once filled may be filled in such manner as the legislature shall direct.

The statute (Private Acts 1911, ch. 237, secs. 16 and 24), authorizing the board of county commissioners, created by said act, to fill vacancies occurring in the board or in the positions it is authorized to fill, is not unconstitutional for that reason, because

Prescott v. Duncan.

the vacancies contemplated are such as happen after the office has been created and filled, and fall within the constitutional provision (art. 7, sec. 4) authorizing the filling of all vacancies not otherwise provided for to "be made in such manner as the legislature shall direct," and do not fall within the constitutional provision (art. 11, sec. 17) requiring county offices created by the legislature to be filled by the people or county court, and not otherwise, because the vacancies contemplated by this provision are the vacancies which occur immediately upon the creation of the county office. The said two provisions must be construed together so that both may stand. (*Post*, *p.* 147.)

Acts cited and construed: Private Acts 1911, ch. 237, secs. 16 and 24.

Constitution cited and construed: Art. 7, sec. 4; art. 11, sec. 17.

Cases cited and approved: Condon v. Maloney, 108 Tenn., 82; Richardson v. Young, 122 Tenn., 471.

## FROM SHELBY.

Appeal from the Chancery Court of Shelby County (Part II).—FRANCIS FENTRESS, Chancellor.

FITZHUGH & BIGGS and G. J. MCSPADDEN, for complainants.

CARUTHERS EWING, WRIGHT & WRIGHT, W. A. PERCY, and R. LEE BARTELS, for defendants.

MR. JUSTICE LANSDEN delivered the opinion of the Court.

The complainants Prescott and Powell are members of the board of turnpike commissioners of Shelby county,

and the complainant Fletcher is bookkeeper of the board upon a salary, and as such and as taxpayers and citizens they file this bill in the second chancery court at Memphis to impeach chapter 237 of the Acts of 1911 as unconstitutional and void. The defendants, John B. Duncan, Hayden M. McKay, and E. W. Hale, are members of the Shelby county commission created by the act assailed. It is alleged that the complainants were forcibly deprived of their office by the defendants who have usurped the functions and duties of the board of workhouse commissioners, board of turnpike commissioners, the county board of health, and the board of poorhouse commissioners of Shelby county, as well as the duties and functions of the county court of said county, and that they are proceeding to make contracts for the county and to expend under the act assailed, large sums of money to the detriment of the complainants and other taxpayers of the county. The bill was demurred to; the demurrer raising the question that the act under which the defendants are claiming office and proceeding to do the things charged in the bill is a valid and constitutional enactment. The case was heard before the Honorable Francis Fentress, chancellor of Division No. 2 in whose court the bill was filed, and the Honorable F. H. Heiskell, chancellor of Division No. 1, sitting together, who, in separate written opinions, held the act to be constitutional. From this decree, the complainants have appealed and assigned errors.

The first error assigned is that the act in substance takes away from the county court practically all of its functions as the administrative agency of the county, and especially as to turnpikes, the workhouse, the county health, the poor, and the poorhouse commissioners, the election of county officers, including the workhouse commissioners, turnpike commission, members of the board of health, and members of the poorhouse commission, election of the subordinate officers of the county, purchasing of county supplies, and the control of the county finances, control of the county buildings, including the courthouse, the control of the dirt roads of the. county worked by convicts, including repairing and building county turnpikes, the approval of the bonds of the county officers, the making and signing of contracts for the county, and for county purchases and disbursements of county revenue, which includes substantially all of the duties and functions of the county court, except the levying of taxes, electing a coroner and ranger, and filling the vacancies in county offices in certain contingencies provided by the constitution and not covered by the act.

The second assignment is that the act is unconstitutional because it authorizes county officers created by the legislature to be elected by the commissioners, thereby violating section 17 of article 11 of the constitution which provides that "No county office created by the legislature shall be filled, otherwise than by the people or the county court."

The title of the act in question is:

126 Tenn.—8

"An act to create a board of county commissioners in counties having a population of 190,000 or more according to the federal census of 1910, or any subsequent federal census; to provide for their election, qualification, and removal; and to prescribe their duties and fix their compensation."

The act is too voluminous to be set out in full in this opinion, and the following synopsis of its contents is taken from the brief of counsel for complainants:

"The first section of the act creates a board of county commissioners, provides for their first election, and fixes their term of office.

"The second section provides for the qualification of the board of commissioners; that two of said commissioners shall at the time of their election reside out of the corporate limits of the county seat, while the other members may be a resident within the corporate limits of the county seat, that no member of the county court shall be eligible as a member of the commission.

"The third section vests the board of commissioners with all the powers and duties now vested in or imposed upon the workhouse commission, turnpike commission, county board of health and the poorhouse commission.

"The fourth section abolishes the above-mentioned commissions and boards and vests the duties of the same in the board of commissioners. . . .

"The seventh section divides the work of the board into three departments, to-wit:

"(1)    The department of workhouse and turnpike roads.

"(2)    The department of county health.

"(3)    The department of purchasing and finance.

"The eighth section vests in the board the authority to appoint or elect:

"(a)    Jail physician or county health officer.

"(b)    Superintendent of county morgue.

"(c)    Superintendent of emergency hospital.

"(d)    Physician in charge of the poor and insane asylum and workhouse.

"(e)    Jail engineer.

"(f)    Courthouse janitor.

"(g)    Courthouse engineer.

"(h)    Courthouse electrician.

"(i)    Courthouse policeman.

"(j)    Night watchman, and

"(k)    'Such subordinate help as may be necessary in order to properly conduct the affairs of the county which are under this act committed to their supervision and charge.'

" 'The board of commissioners is likewise authorized to fix the compensation of the officers enumerated, as well as the subordinate help, but as to the enumerated officers a maximum salary per annum is provided by this section.  The board is given authority to remove any officer at any time, without cause, or as expressed in the act, at their "will and pleasure." '

"This section also authorizes the payment of salaries by warrants drawn on the county trustee, signed by the chairman and secretary of the commission.  It is then provided that 'none of said officers shall be paid or re-

ceive, directly or indirectly, any further or greater compensation than that above provided. Living in dwellings provided by the county or the commissioners shall not be treated as receiving additional compensation.'

"Section 9 makes it a felony for any of the commissioners or officers, or any subordinate officer or employee of the commission, to accept directly or indirectly any moneys other than that stipulated for performing the duties of the office.

"Section 10 provides that no commissioner or officer named, or any subordinate or regular employee of the commission shall be connected with any contract with the county or commission, and that a violation of the same shall be a felony.

"Section 11 provides that no contract shall be awarded by the board of commissioners to any person who shall be related in the third degree to any one of the commissioners.

"Section 12 defines the duties of the chairman of the commission and charges him with the purchasing of all supplies for the various departments, gives to him special care and custody of the courthouse and all employees, as well as the books of the commission, and the title of 'commissioner of purchasing and finance.'

"Section 13 makes it the duty of the commissioner of county health to have charge of the health department of the county, the poor, and the insane asylum, the county morgue, the emergency hospital, the health of the prisoners in the county jail, and the special supervision of all employees in the health department.

Prescott v. Duncan.

"Section 14 gives to the other commissioner the title 'commissioner of the department of workhouse and turn- pike roads' and devolves upon him general supervision over the dirt roads of the county worked by the convicts, the building and repairing of all turnpikes, the full charge of all employees in the department, and requires of him all duties now required of the workhouse super- intendent and the superintendent of turnpikes.

"Section 15 provides for the assignment of the com- missioners to the respective departments.

"Section 16 applies to vacancies occurring in the board of commissioners, and vests the remaining com- missioners with power to elect a commissioner to fill such vacancy 'who shall hold office during the unex- pired term.' In the event of a tie vote, it is provided that the duties of the vacant office shall be imposed upon and discharged by the other commissioners. . . .

"Section 18 provides that 'every officer' authorized to be elected by the board of commissioners shall be nominated by the commissioner in whose department such officer belongs, and that no such officer shall be elected by the board except on such nomination by such commissioner. It further provides that if the commis- sioner shall fail for thirty days to nominate such offi- cer, then any member of the board shall have a right to make a nomination, but limits the right of the board as far as an election is concerned to the nomination so made.

"Section 19 authorizes the commissioners to fix the amount of bonds and method of approval required 'of

all elective, appointed, or subordinate officers,' and that such bonds must be made by a surety company doing business in the State and county.

"Section 20 denies to any commissioner during the term for which he is elected or appointed to accept any other office under the county, or State, or municipality. . . .

"Section 25 makes it a misdemeanor for any candidate for the office of commissioner to directly or indirectly give or promise any person or persons any office, profit, or anything of value for the purpose of influencing or obtaining the political influence, aid, or vote of such person or persons. . . .

"Section 28 provides for the preparation of a budget to be submitted to the county court, in order that the county court may determine the amount of taxes that may be necessary to levy.

"Section 29 provides for an audit of the books of the commissioners annually.

"Section 30 provides for the removal by recall of any commissioner. . . .

"Section 32 provides that all acts inconsistent with and in conflict to this act be repealed."

The county court existed in this State prior to the adoption of the constitution of 1796. After the adoption of that instrument, the legislature passed a number of acts relative to the county courts, conferring upon them the duty of keeping and maintaining the courthouse and prison, of performing all kinds of public and county business, fixing the day for the election of

coroners and rangers, providing for the keeping, reading, and signing of the minutes of their proceedings, conferring upon it the power to appoint trustees of the various county academies and commissioners for the towns of their respective counties, power to appropriate public money for certain county purposes, power to levy taxes, to build courthouses and jails or to repair them, power to erect poorhouses, appoint commissioners to look after the same and levy taxes for their maintenance, power to grant licenses to persons to erect gates across public highways, power to supervise and control roads and ferries, to take bonds of county officers, and many others of the like. In short, up to and after the adoption of the constitution of 1870, a quarterly county court was the only local administrative authority recognized by our constitution and laws. The constitution of 1834 in section 1 of article 11 provided, "All laws and ordinances now in force and use in this State not inconsistent with this constitution shall continue in force and use until they shall expire, be altered or repealed by the legislature," and section 402 of the Code of 1858 provided: "Every county is a corporation, and the justices in the county court assembled are the representatives of the county and authorized to act for it."

With this state of affairs existing over a long series of years, the constitution of 1870 was adopted, containing the following reference to justices of the peace and county courts. Section 26 of article 2 provides:

"No appointment in the militia, or to the office of justice of the peace shall be considered a lucrative office, or operate as a disqualification to a seat in either house of the general assembly."

Section 1 of article 6 provides:

"The judicial power of the State shall be vested in one supreme court, and in such circuit, chancery and other inferior courts as the legislature shall from time to time ordain and establish; in the judges thereof, and in justices of the peace. The legislature may also vest such jurisdiction in corporation courts as may be deemed necessary. Courts to be holden by justices of the peace may also be established."

Section 15 of article 6 provides:

"The different counties of this State shall be laid off, as the general assembly may direct, into districts of convenient size, so that the whole number in each county shall not be more than twenty-five, or four for every one hundred square miles. There shall be two justices of the peace and one constable elected in each district by the qualified voters therein, except districts including county towns, which shall elect three justices and two constables. The jurisdiction of said officers shall be co-extensive with the county. Justices of the peace shall be elected for the term of six, and constables for the term of two years. Upon removal of either of said officers from the district in which he was elected, his office shall become vacant from the time of such removal. Justices of the peace shall be commissioned by the governor. The legislature shall have power to pro-

vide for the appointment of an additional number of justices of the peace in incorporated towns."

Section 1 of article 7 provides:

"There shall be elected in each county, by the qualified voters therein, one sheriff, one trustee and one register; the sheriff and trustee for two years, and the register for four years. But no person shall be eligible to the office of sheriff more than six years in any term of eight years. There shall be elected for each county by the justices of the peace, one coroner, and one ranger who shall hold their office for two years; said officer shall be removed for malfeasance, or neglect of duty, in such manner as may be prescribed by law."

Section 2 of article 7 provides:

"Should a vacancy occur, subsequent to an election, in the office of sheriff, trustee or register, it shall be filled by the justices; if in that of the clerks to be elected by the people, it shall be filled by the courts; and the person so appointed shall continue in office until his successor shall be elected and qualified; and such office shall be filled by the qualified voters at the first election for any of the county officers."

Section 9 of article 11 provides:

"The legislature shall have the right to vest such powers in the courts of justice, with regard to private and local affairs, as may be expedient."

Section 17 of article 11 provides:

"No county office created by the legislature shall be filled otherwise than by the people or the county court."

The first article to the schedule of the constitution of 1796 is as follows:

"(1)   That no inconvenience may arise from a change of the temporary to a permanent State government, it is declared, that all rights, actions, prosecutions, claims and contracts, as well as individuals as of bodies corporate, shall continue, as if no change had taken place in the administration of government."

The schedule of the constitution of 1834 in the first article provided:

"That no inconvenience may arise from a change of the constitution, it is declared, that all officers, civil and military, shall continue to hold their offices; and all the functions appertaining to the same shall be exercised and performed according to the existing laws and constitution, until the end of the first session of the general assembly which shall sit under this constitution, and until the government can be reorganized and put into operation under this constitution, and in such manner as the first general assembly aforesaid shall prescribe, and no longer."

While the county court exercised jurisdiction over many local affairs prior to the adoption of the constitution of 1796, the legislature soon after the adoption of that instrument enacted a number of laws enlarging its jurisdiction and duties. The first session of the general assembly after the adoption of the constitution of 1834 in the first chapter of the published acts of the twenty-first general assembly provided a comprehensive scheme for reorganizing the county courts by laying

off the several counties of the State into districts of convenient size within which justices of the peace, and constables should be elected. The schedule of the constitution of 1870 is essentially different from those of the preceding constitutions with respect to the continuation of the existing government after the new constitution went into effect. Because of the existence at that time of the reconstruction government following the Civil War, the convention arranged its schedule so as to eliminate all existing public officials as speedily as practicable. It was provided, however, that the governor of the State, the members of the general assembly, and all officers elected at or after the general election of March, 1870, should hold their offices for the terms prescribed in the new constitution. And section 1 of article 11 preserved the existing system of laws until changed by the legislature unless changed or abolished by the constitution itself.

From the foregoing, it is insisted that the constitution of 1870 recognized the county court as an existing institution and made it a constitutional court with the powers and duties which at that time were devolved upon it by law, and the legislature cannot deprive it of any of the powers which were vested in it at the time of the adoption of the constitution. While it is conceded that the quarterly county court, as it is known to us, has no common-law powers, still it is said it is no answer to say that its powers are purely statutory because the constitution of 1870, having given recognition to the county court as a constitutional court, imported

into the term all of the powers which were vested in it by the statute at the time. It is also said that the legislature of Tennessee is without power to pass any law abrogating the functions and jurisdictions of the quarterly county court, except as it is expressly conferred upon it by the constitution. The gist of the argument against the validity of the act in question is embodied in the following extract from complainant's brief:

"The county court is one of the oldest institutions known to the Southern States. It is a direct descendant of, or, rather, a development of, the old Saxon witenagemote. From the earliest period in history, the different communities in England have had the right of self-government. Blackstone points out the development of these institutions. The right of local self-government has been tenaciously held to by the people throughout all time. And, when the colonies were planted in America, this development proceeded. In the New England colonies it developed into a simple community organization known as the town meeting. In the more southern colonies, where the people held large tracts of land worked by their slaves, it developed into the county government. In North Carolina, the county court was a recognized institution of local government before the territory of Tennessee was ceded to the United States. The county court has been in existence in Tennessee even before the first constitution was adopted. When the constitution of 1870 was adopted, for nearly seventy-five years, the county courts of Tennessee had been the

governing body of the county. It had collected and expended the county revenue. On it was devolved the duty, and to it was given the power, of taking care of the sick and insane and poor; to build roads and bridges; to maintain the workhouse and jail, and to erect all needful public buildings, and, in short, to exercise every function of local self-government except those that devolved upon the sheriff, the trustee, and the register. Of course, always the judicial department has been an arm of the State government, and in no wise pertains to the county or local government. And justices of the peace, in so far as they are part of the judicial department and are courts, are State officers.

"Now, when the constitution of 1870 provides for the subdivision of the State into counties, it does so for a definite and fixed purpose. That purpose is to provide for a local government; for an administration of local political matters; for the collection of revenues to be devoted to local purposes; for the expenditure of such revenues for local purposes. It would be impossible to conceive of a constitution that did not provide for such local government. The subdivision of the State into counties could be for no other purpose. A sheriff was provided for for purely county and local purposes. A trustee was provided for for purely county and local purposes. And so with the offices of register, ranger, and coroner. Then the constitution elaborately provides for the subdivision of the county into districts and for the election of justices of the peace. Therefore it was intended that the justices of the peace should

have and exercise their time-honored duties as members of the county court. Unless the county court was to exercise the powers of local government, absolutely no provision was made in the constitution of Tennessee for such purposes. Clearly, then, it was intended that the government of the county should remain as it always had been."

From the foregoing extracts from the constitution of 1870 it will be seen that the quarterly county court is not mentioned in that instrument as it was not in the constitutions of 1834-1796. Its existence as a creature of the constitution must be implied from the clauses above quoted, together with the fact of its contemporaneous existence as an institution of local government in all counties of the State. When the constitution of 1870 conferred "upon the justices of the peace" the performance of certain duties which could only be done by them in their collective capacity, the convention must have had in mind the quarterly county court; so also, when it directed the performance of political administrative duties by the "county court," it must have intended the quarterly county court; because the quorum court in all of its history in this State had never exercised political or administrative power, and, according to well-established rules of construction, it is but just to assume that the convention intended the court to act as it had always done under the existing laws and customs. Therefore, it is clear that the quarterly county court is a constitutional court which can-.

Prescott v. Duncan.

not be abolished by legislative enactment. *Pope* v. *Phifer*, 3 Heisk., 682; *Redistricting Cases*, supra.

This much is conceded by counsel for defendants. Hence, the question involved in the determination of the validity of the act under consideration is one of narrow scope. It is not whether the quarterly county court is a constitutional court. It relates alone to the powers of that court preserved to it by the constitution of 1870. Formulated into a question, it is, Did or not the convention of 1870 intend to preserve the quarterly county court as a constitutional body with all of the statutory powers which had been previously conferred upon it? Or did it intend to so preserve it for the purpose only of exercising the powers conferred upon it by the constitution?

It will be useful in this connection to state some familiar rules for the construction of State constitutions which have been recognized by this court throughout the history of the State. The legislature has all legislative power not prohibited by the constitution of the United States or the constitution of this State either expressly or by necessary and fair implication. *Jackson* v. *Nimmo*, 3 Lea, 599.

State constitutions are adopted as a whole, and a clause which, standing by itself, might seem of doubtful import may yet be made plain by comparison with other clauses or portions of the same instrument, therefore it is a proper rule of construction that the whole is to be examined with a view to arriving at the true

intent of each part. Cooley's Constitution Limitations, 71.

The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it, and this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey the meaning intended, and, unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain except to enforce it. Id., 69. Constitutions should operate prospectively, unless the words employed show a clear intention that it should have a retrospective effect. Judge Cooley says that this rule is one of such obvious convenience and justice that it must always be adhered to in a construction of constitutions, unless in cases where there is something on the face of the instrument putting it beyond doubt that it was meant to operate retrospectively. Id., 77.

Another rule of general application often referred to in our cases is that stated by Judge Cooley, as follows:

"It is also a very reasonable rule that a State constitution shall be understood and construed in the light and by the assistance of the common law, and with the fact in view that its rules are still left in force. By that we do not mean that the common law is to control the constitution, or that the latter is to be warped and perverted in its meaning in order that no inroads, or as few as possible, may be made in the system of common law rules, but only that for its definitions we are

Prescott v. Duncan.

to draw from that great fountain, and that, in judging what it means, we are to keep in mind that it is not the beginning of law for the State, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes. It is a maxim with the courts that statutes in derogation of the common law shall be construed strictly—a maxim which we fear is sometimes perverted to the overthrow of the legislative intent—but there can seldom be either propriety or safety in applying this maxim to constitutions. When these instruments assume to make any change in the common law, the change designed is generally a radical one, but as they do not go minutely into particulars, as do statutes, it will sometimes be easy to defeat a provision, if courts are at liberty to say that they will presume against any intention to alter the common law further than is expressly declared. A reasonable construction is what such an instrument demands and should receive, and the real question is what the people meant, and not how meaningless their words can be made by the application of arbitrary rules."

We have set out the foregoing text in full for the reason that the complainants' case is practically built upon it, and there seems to have been some misapprehension of its scope and application.

From the foregoing generally accepted rules of construction, it is manifest that the legislature may take from the county court all power not conferred upon

it by the constitution expressly or by necessary impli-
cation.   Powers conferred, as well as restraints upon
inherent power, may be supported by such implications
as are necessary to give effect to the intent of the people
in conferring the one or setting the bounds of restraint
upon the other.   But, in drawing implications of the
people's intent in using the words under consideration,
the courts must not only look to every part of the con-
stitution, but it must be borne in mind that the words
themselves were used in a prospective sense, and were
selected with that care and consideration to be expected
from the body of distinguished men who framed the in-
strument.

No implication of intention with respect to one part of
the instrument can be justified which does violence to
a plainly expressed intention to be found in another
part.

So we find the quarterly county court impliedly im-
bedded in the constitution of 1870, and this implica-
tion arises solely from the delegation by that instru-
ment of certain duties to "justices of the peace" and
the "county court" which could only be performed by
them when assembled in body.  This assemblage was
well known at the time as the quarterly county court.
An implication that the quarterly county court is a
constitutional court is necessary in order to give effect
to the plainly expressed intention that the "justices
of the peace" and the "county court" should perform
the duties directly imposed upon them.   If the consti-
tution did not expressly require that "there shall be

elected for each county by the justices of the peace one coroner and one ranger" (section 1, art. 7) ; that vacancies "in the office of sheriff, trustee, or register . . . shall be filled by the justices" (section 2, art. 7) ; that "No county office created by the legislature shall be filled otherwise than by the people or the county court" (section 17, art. 11) ; there could be no just implication that the quarterly county court is a constitutional court because the implication of such restraint upon the power of the legislature to provide other and different forms of local government for the counties would not be necessary to support and give effect to any part of the constitution. Necessary implications may be made, but unnecessary ones, however probable or plausible, cannot. And the necessity for the implication must be found in the constitution. It is quite true that the constitution is not the beginning of law for the State and that it assumes the existence of a well-understood system of government which is to remain in force and be administered under the limitations and restrictions which it imposes. But this a rule of construction to be resorted to in the proper interpretation of words employed to express the "limitations and restrictions" under which the existing system is to be administered. It can never be used to import the existing system of government into the constitution unless there is to be found within the instrument itself some provision which would fail of its purpose unless supported by a just implication. It is this rule which justifies the implication we have drawn that the quarterly county

court is a constitutional court. But that its proper application would import every legislative power and function which the county court possessed at the time into the constitution, thereby raising an implied limitation on the inherent power of the people, through the legislature, to provide such form of local government as time and experience may require, is without justification in reason or authority.

It must be borne in mind that the quarterly county court is not mentioned in the constitution. It is found there by implication only. Hence, the rule of construction last referred to cannot be resorted to to furnish a definition of the words themselves. The most that can be said is that, when the convention intended the quarterly county court as the body to which it had delegated certain specific duties, and in this way imbedded it in the constitution, it must be presumed to have intended to import into the constitution all powers which it possessed by statute as a part of the existing system of government. The absurdity of such a conclusion is manifest upon the slightest reflection. If direct references to parts of the existing system of government (to say nothing of implications) were to be given the effect contended for, the constitution so construed would transfix almost all of the existing system of laws at the time of its adoption into fundamentals beyond the control of the legislature, and every detail of existing law thus imported into the constitution would become immutable and unchangeable. The legislature would be bound hand and foot, unable to

Prescott v. Duncan.

repeal its own enactments, or provide for the continued changes of existing laws made necessary by the ever changing needs of man.

But the constitution was not made to preserve the past. It was made for the future. Its effect is prospective and not retrospective. It would be curious indeed if, because of the constitution, the system for the local government of the counties is the only thing in our laws that cannot progress. The fact that we have had no other system than the county court for more than 100 years is a strong testimonial to its efficiency as well as the high place it has found in the affection and esteem of the people, and, while all must revere it for its age and honor it for its history, these considerations cannot weigh in determining its constitutional status.

The foregoing reasons are made conclusive by a consideration of section 9 of article 11. It provides that "the legislature shall have the right to vest such powers in the courts of justice, with regard to private and local affairs, as may be expedient." This section cannot be reconciled with the thought that the quarterly county court is the exclusive agency of the constitution for the local government of the counties.

Inferior courts of justice may be ordained at the discretion of the legislature (section 1, art. 6) and it may vest in them such powers in respect of local affairs as it may deem expedient, and not conflicting with some other provision of the constitution. And so it may in the circuit and chancery courts. This

section must be given its proper meaning and effect, and to do so, forbids us to raise an implication in favor of county courts which would destroy it. Hence, we hold that the quarterly county court is a constitutional court held in existence by the constitution for the purpose only of performing the duties directly imposed upon it by that instrument. As to those duties, the legislature cannot impair or destroy them. But whether the quarterly county court in respect of the matters contained in the act in question shall remain the agency of local government is a matter for the exclusive determination of the legislature.

All that has been said by the counsel concerning the ancient origin and high character of the county court, its efficiency as an agency of local government, and its place in the affections of the people, must be brushed aside by us as political matters for the decision of the people and the legislature. Nor is the principle of local self-government involved in this case. The integrity of the counties as the unit of government is not affected by the act in question. The right of the people to select the officers and agents to administer their local affairs is fully preserved. The only change made is in the form of the instrumentality selected as the agency of local government. Hence, the authorities cited and the arguments made to show that the principle of local government is firmly imbedded in our constitution may be dismissed as immaterial matters not arising upon the record. The board of commissioners provided for in the act is elect-

ed by the people of the county. Justices of the peace composing the quarterly county court are elected by the people of the civil districts and incorporated towns which they represent. The only change made in this respect is that the commissioners are elected by the people of the county at large. This of course is no assault upon the doctrine of local self-government.

The foregoing view of the constitutional status of the quarterly county court is not opposed by any previous decisions of this court when rightly understood. Different views of the jurisdiction and powers of the court have been expressed in various dicta of the different judges when discussing questions different to the one under consideration in this case. For instance, in *L. & N. R. R. Co.* v. *County Court*, 1 Sneed, 637, 62 Am. Dec., 424, it was said:

"The county court, as well as all other inferior courts, is the creature of the legislature. . . .

"The legislature of 1835, the first after the adoption of the present constitution, did establish a county court to be held by justices of the peace, and assigned to it its jurisdiction. That and subsequent acts prescribed the number of justices necessary for the exercise of certain specified functions. . . . The legislature, being the creator, can certainly shape the creature as it chooses."

In *Justices of Cannon County* v. *Hoodenpyle*, 7 Humph., 145, it was said in substance that the power to assess taxes vested in the legislature by the consti-

tution had been delegated by statute to the quarterly county court.

In *Young* v. *Shumate,* 3 Sneed, 369, it was said:

"The jurisdiction of the county court, though of an equitable nature, is very limited in its extent. It is merely what the statute has expressly conferred and nothing more."

In *Grant* v. *Lindsay,* 11 Heisk., 651, it was said by Chief Justice Nicholson:

"The constitution authorizes the legislature to vest in the courts of justice such powers with regard to private and local affairs as may be deemed expedient. Article 11, section 9. Under this provision of the constitution the legislature has vested in the county courts the powers defined in the Code in regard to taxation and to roads. The county courts are thereby constituted corporations with defined powers, and with the justices thereof as representatives of the county."

But in *Wood* v. *Tipton County,* 7 Baxt., 112, 32 Am. Rep., 561, the same learned judge said:

"The power of county courts over roads, bridges, etc., is a prerogative of sovereignty delegated by the constitution to the county court."

In *Railroad* v. *Wilson County,* 89 Tenn., 597, 15 S. W., 446, it was said:

"Though the county court existed in some form in North Carolina before the organization of this State, and may be said to have been recognized by our constitution of 1796 as one of the institutions of the State then existing (*Pope* v. *Phifer,* 3 Heisk., 682), it is nev-

ertheless a creature of statute merely, possessed alone of statutory jurisdiction, and wholly wanting in common law powers."

In *Walsh* v. *Crook*, 91 Tenn., 388, 19 S. W., 19, it was said:

"The county court has no jurisdiction beyond that expressly conferred by statute."

In *Shelby County* v. *Exposition Co.*, 96 Tenn., 653, 36 S. W., 694, 33 L. R. A., 717, it was said:

"County courts in this State are creatures of statute merely, possessed of statutory jurisdiction alone, and wholly wanting in common law powers."

In the *Judges' Salary Cases*, 110 Tenn., 370, 75 S. W., 1061, our present chief justice said:

"They were created by the general assembly under the authority given it in the constitution to ordain and establish such inferior courts from time to time as might be necessary, and have only such jurisdiction and power as has been expressly vested in them by enactments of the legislature."

In *State* v. *Akin*, 112 Tenn., 603, 79 S. W., 805, it was said:

"The objection raised to this act in the lower court, and renewed here is that its purpose and effect is to destroy the county court of Maury county, and, this being so, it is void because as it insisted that court is placed by the constitution beyond legislative impairment or destruction. While the case of *Pope* v. *Phifer*, 3 Heisk., 682, announces that the county court is a constitutional court, yet it must be considered that the

later utterances of this court have thrown grave doubt upon the soundness of that doctrine."

In *State, ex rel., v. Powers,* 124 Tenn., 553, 137 S. W., 1110, Mr. Justice Green said:

"We are furnished with no authority for the proposition that it is beyond the power of the legislature to delegate the taxing power to a proper county agency other than the quarterly court, and we would be slow to reach such a conclusion."

In all of the foregoing cases, except the case of *State* v. *Powers,* it may be conceded that the quotations made are dicta of judges delivering the opinions. They, however, indicate the view that this court has entertained with respect to the jurisdiction and powers of the county court. The latter case, however, is directly in point and is authority for the proposition that the legislature may confer power to levy taxes upon another body than the county court. This view is clearly stated by Dr. Andrew B. Martin, professor of law for many years in Cumberland University, and an eminent authority, in his edition of Caruthers' History of a Law Suit:

"There is no provision in the constitution of the State establishing the county court, yet it is said as such courts were in existence at the adoption of the constitution and were not discontinued by that instrument, but by its provisions certain duties were imposed on the 'justices of the peace' evidently in their collective capacity, and on the 'county court,' it is reasonable to infer and it is held that the constitution contemplated the continued existence of such courts for the performance

of the duties therein imposed, and in this respect they are deemed constitutional courts, and must continue to exist until they are abrogated by the action of the people in changing the constitution."

*Pope* v. *Phifer*, supra, does not contravene anything that is decided in this case. That case held that chapter 65 of the Session Acts of 1868 was unconstitutional and void. While many things are said in the course of the opinion which imply that the jurisdiction and powers of the quarterly county court are much broader than we have just held them to be, the point decided was that it was beyond the power of the legislature to entirely abolish the quarterly county court as a local governmental agency. By section 5 of chapter 65 of the Acts of 1867-68, it was provided that the county commissioners were vested with the powers conferred on the county court by sections 4206, 4207, 4211, 4212, 4213, 4214 and 4215 of the Code of Tennessee, 1858. These are the sections which constitute the county court the local governmental agency of the county.

Section 6 of the act was as follows:

"The magistrates of the said county of Madison shall be and are hereby relieved from all duties and obligations incidental to their offices as members of the quarterly court of said county."

Sections 19, 20, and 21 of the act are as follows:

"Sec. 19. The quorum courts of the counties prescribed for in this act, be and the same are hereby abolished; that all the powers, duties and jurisdictions now vested in the quarterly court shall be vested in the

board of commissioners, whose duty it shall be to perform and discharge all the obligations now imposed upon the quarterly court.

"Sec. 20.   That the power and authority now vested in the chairman of the county court, be and the same are hereby vested in the president of the board of commissioners, whose duty it shall be to perform all the duties and discharge all the obligations imposed by law upon and exercised by the chairman of the county court in and out of court time.

"Sec. 21. . That the magistrates of the county provided for by this act, be and they are hereby relieved from all the duties and obligations incident to them as members of the quarterly or county court, which duties are to be performed by the board of county commissioners."

So it will be seen that *Pope* v. *Phifer* was correctly decided upon its facts.   It is limited, however, to the point determined.   The case was overruled in the *Redistricting Cases* in so far as it held that the legislature could not pass a special law affecting particular counties as governmental agencies, and we now overrule other portions of the case, in so far as it is said that the legislature is without power to provide agencies of local county government other than the quarterly county court within the limits stated in this opinion.   The case has often been disapproved as shown by the authorities, supra, and was expressly disapproved by inference, though not by direct reference, in the case of the *State* v. *Powers*, supra.   Dr. Martin, in his edition of History of a

Law Suit, expressed the same view of *Pope* v. *Phifer*, with which, we think, the profession generally agrees, as follows:

"In *Pope* v. *Phifer*, county courts are held constitutional so far as they are required to perform the certain duties imposed on them by the constitution. These are few in number, and none of them are judicial in character. See constitution, art. 7, secs. 1, 2; article 11, section 17. All its other duties and powers have been imposed by the legislature and may be taken away by it. This would leave to the county court the performance of the constitutional duties, which, as stated in the sections cited, are the election of one ranger, one coroner, and the right to fill county offices created by the legislature."

*State* v. *Cummins*, 99 Tenn., 667, 42 S. W., 880, is not in conflict. In that case it was held the legislature could not take from the sheriff the custody of jails and the emoluments incident thereto. This was held to be true because the sheriff at common law was the keeper of the county jail and had given to him the custody of the prisoners confined therein; and, when the constitution of 1870 provided for the election of a sheriff without defining his duties, it was held that the term "sheriff" must be understood in its constitutional sense as including all the duties and powers, and having all the privileges and emoluments, which belonged to that office at common law. "The office of sheriff at common law included the custody of the jail of right, and this custody was annexed as an incident to the

office of sheriff." *Felts* v. *Mayor of Memphis*, 2 Head, 651.

*Jackson* v. *Nimmo*, 3 Lea, 597, is an interesting case when read in connection with *Pope* v. *Phifer*, supra. By the Act of 1877, ch. 97, the legislature conferred upon the chancery courts of this State concurrent jurisdiction with the circuit courts of all civil causes of action triable in the circuit courts except for injuries to the person, property, or character involving unliquidated damages. This act was assailed as unconstitutional because it conferred upon the chancery court jurisdiction of matters wholly foreign to its original jurisdiction; the argument being that the chancery court when referred to in article 6, section 1, of the constitution, was meant to be preserved in the constitution with the same jurisdiction that it had at the day of the adoption of that instrument. It was held in that case that the legislature by section 8 of the same article of the constitution was given power to change the jurisdiction of the chancery court. This last section of the constitution is very similar in its relation to the chancery court that section 9 of article 11 bears to the county court. While it is said in the opinion that the convention must have understood when they referred to the chancery court in the constitution that it was the history of that court that its jurisdiction was constantly enlarging in order to meet the ends of justice, and therefore it must have been intended that its jurisdiction could be changed; still we apprehend that the true ground of the decision must be based upon section 8

of article 6, because, while it is true that the history of the chancery court is that its jurisdiction has been constantly enlarged, it is equally true that it was enlarged only so as to embrace matters of equitable cognizance. It had never been a part of its history that the chancellors had enlarged the jurisdiction of the chancery court so as to include matters of purely legal cognizance, and therefore, if it could be said, which we do not doubt, that the convention understood that the jurisdiction of the chancery court was constantly enlarging, it must also be said that they likewise understood that it had never been enlarged by the chancellors so as to include matters contained in the act of 1877. Therefore *Jackson v. Nimmo* must rest upon section 8 of article 6 of our constitution which provides "that the jurisdiction of the circuit, chancery, and other inferior courts shall be as now established by law until changed by the legislature." The court expressly placed it upon that ground which we conceive to be the true basis of the decision, and this holding, by analogy at least, supports this opinion to the effect that section 9 of article 11 reserves to the legislature the power to provide other and different agencies of local county government than the county court.

The second assignment is that the act is unconstitutional and violative of section 17, art. 11, because it confers on the board of commissioners the power to appoint county officers therein mentioned in the eighth section of the act. The section of the constitution involved is as follows: "No county office created by the

legislature shall be filled otherwise than by the people or the county court."

By section 3 the act confers upon the board of commissioners all powers and duties vested in and imposed upon the workhouse commission, turnpike commission, county board of health, and the poorhouse commission. By section 4, the foregoing commissions are abolished, and the powers and duties imposed by law upon them and their several members are vested in and imposed upon the board of commissioners. Section 7 classifies and arranges the work of the board of commissioners by dividing it into three departments: First, the department of workhouse and turnpike roads; second, the department of county health; and, third, the department of purchasing and finance. By section 8, the board of commissioners are authorized to appoint the following "officers" whose terms of office shall be at the will and pleasure of the board of commissioners, whose compensation shall be fixed on an annual basis and paid in monthly installments:

"(1)   A jail physician or county health officer at a salary not to exceed two thousand dollars ($2,000) per annum.

"(2)   Superintendent of county morgue at a salary not to exceed twelve hundred dollars ($1,200) per annum.

"(3)   Superintendent of emergency hospital at a salary not to exceed twelve hundred dollars ($1,200) per annum.

"(4)   Physician in charge of poor and insane asylum

and workhouse at a salary not to exceed eighteen hundred dollars ($1,800) per annum.

"(5)   A jail engineer at a salary not to exceed fifteen hundred dollars ($1,500) per annum.

"(6)   A courthouse janitor at a salary not to exceed fifteen hundred dollars ($1,500) per annum.

"(7)   A courthouse engineer at a salary not to exceed twenty-four hundred dollars ($2,400) per annum.

"(8)   A courthouse electrician at a salary not to exceed twelve hundred dollars ($1,200) per annum.

"(9)   A courthouse policeman at a salary not to exceed nine hundred dollars ($900) per annum.

"(10)   A night watchman, at a salary not to exceed ten hundred and twenty dollars ($1,020) per annum.

"The commissioners shall have the power to employ such subordinate help as may be necessary in order to properly conduct the affairs of the county, which are under this act committed to their supervision and charge."

The foregoing section originated in the constitution of 1870 and we have no doubt it was suggested to the convention by the state of the government existing at and just prior to its meeting. The counties had been afflicted with an orgie of commissions appointed from Nashville, many of them hostile in sentiment and conduct to the people over whom they were set, and most of them appointed because of this hostility. To insure against a repetition of such a regime, the section of the constitution above quoted was provided.

The question for determination is whether the appointees of the board of commissioners authorized by section 8 are county officers within the meaning of this section of the constitution. It should be observed that the workhouse commission, turnpike commission, county board of health, and poorhouse commission are abolished by the act, and their powers and duties devolve upon the board of commissioners. The duties heretofore performed by these various commissions are partitioned among the board of county commissioners as provided in section 7. Section 8 authorizes the appointment by the board of commissioners of subordinates in these various departments. They have no term of office and no fixed compensation except that a maximum compensation is fixed by the act. No salary is provided for them, but it is provided that their compensation shall be fixed on an annual basis. We think it clear that they are not officers, and the positions which they occupy are not county offices within the meaning of the section of the constitution under consideration; and the legislative intent to confer upon the board of commissioners the official functions exercised by the abolished boards is just as manifest. The duties of the abolished boards as well as their powers, are devolved upon the board of commissioners. No specific duty is devolved upon the alleged officers designated in section 8. Judging from the four corners of the act itself, they have no element of a public office, except that they are engaged by the commission to perform public duties. The chairman of the county court is authorized by the Code

to employ counsel to represent the county. Such counsel would perform legal services for the entire county, but this employment would not make him a county officer. We think they are employees merely, and that the legislature did not intend to, and in fact did not, create ten county offices to be filled by the commission in the discharge of the various duties conferred upon it.

By sections 16 and 24 of the act, the board of commissioners are authorized to fill vacancies that may occur in the board by electing a commissioner to serve out the unexpired term. These sections fall under and are governed by section 4 of article 7, providing as follows: "The election of all officers and the filling of all vacancies not otherwise directed or provided by this constitution shall be made in such manner as the legislature shall direct." The vacancies which the remaining commissioners are authorized to fill by sections 16 and 24 of the act are not the vacancies which exist upon the creation of the office as referred to in *Condon* v. *Maloney*, 108 Tenn., 82, 65 S. W., 871, and *Richardson* v. *Young*, 122 Tenn., 471, 125 S. W., 664, but they are vacancies which happen after the office has been created and filled. The vacancies contemplated by section 17 of article 11, are the vacancies which occur immediately upon the creation of the county office. The two sections of the constitution must be construed together so that both may stand.

The result is that the decree of the chancellor is affirmed.